**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 21-cr-361-TNM** |
| | : | |
| MICHAEL TIMBROOK, | : | |
| | : | |
| Defendant. | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Timbrook to ninety days' imprisonment, followed by three years' probation, 60 hours of community service, and $500 restitution.

**I.      Introduction**

The defendant, Michael Timbrook ("Timbrook"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

On February 9, 2022, Timbrook pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of ninety days' imprisonment, with probation to follow, is appropriate in this case because Timbrook (1) entered the Capitol Building despite having been pepper sprayed by police officers; (2) witnessed assaults against police officers at four different police lines prior to entering the Capitol Building; (3) saw broken glass and rioters climbing through windows when he entered the Capitol Building; (4) ignored the directions of police officers to exit the Capitol and helped breach a police line inside the Capitol Building; (5) witnessed the violent assault of police officers at the Columbus Door; (6) entered a sensitive area in the Capitol Building—the Office Suite of the Speaker of the House—that is not open to the public; and (7) repeatedly spread misinformation about the riot and expressed pride in his participation on social media, writing, for example, "I'm PROUD of everyone who went in there, *even the 30 or so rowdy ones*." (emphasis added).

The Court must also consider that Timbrook's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the certification proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification proceedings. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Timbrook's participation in a riot that actually succeeded in halting the Congressional certification combined with his close proximity to violence, his subsequent attempt to downplay that violence, and his lack of remorse renders a ninety-day jail sentence appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 34 (Statement of Offense), at ¶ 1-7. However, Timbrook's route to the Capitol Building took him across the West Front of the Capitol Grounds, the location were rioters first assaulted police officers and breached the perimeter of the Capitol Grounds. Accordingly, the government will first provide some additional information regarding the West Front of the Capitol Grounds before turning to Timbrook's specific behavior on January 6.

### *The West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

*Timbrook's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Timbrook left his home in Tennessee to travel to Washington D.C. to attend the "Stop the Steal" rally on January 6. Timbrook can be identified in video and photographs taken on January 6 by a distinctive bright orange beanie and dark jacket, as depicted below in Exhibit 4.[2] Additionally, around Timbrook's neck was a dark gaiter with a skull and cross bones on the front that Timbrook frequently wore over his face. Timbrook has been identified in government exhibits with yellow markings.



*Exhibit 4.*

According to Timbrook, on January 6 he joined a large crowd heading towards the U.S. Capitol. *See infra* at 22. As Timbrook approached the Capitol Grounds he heard others say that the Capitol was the place to be stormed. Timbrook also admitted that he went past barricades as he

---

[2] https://www.youtube.com/watch?v=uV3Bfl1zooo&t=1s at 0:52.

entered the grounds. However, publicly available video from January 6 shows that Timbrook did not just pass by barricades, but was stopped in his approach by a row of barricades manned by police officers just past the Peace Circle.[3] Timbrook watched as rioters assaulted officers and broke the line. A still image from the video is included below as Exhibit 5.  As noted above, this breach near the Peace Circle was the first breach of Capitol's perimeter. *See* Exhibit 1 (circle A). In another publicly available video of that violent attack, rioters can be seen shoving officers with the metal barricades, grappling with officers, and even knocking one officer backwards and down onto a flight of stairs.[4]



*Exhibit 5.*

After Timbrook made it past the first police line, he made his way to the Lower West Plaza where he stood next to an entrance into the scaffolding that was guarded by police officers. While standing outside the scaffolding, Timbrook watched as other rioters pushed against, and ultimately

---

[3] https://www.facebook.com/deanm1134/videos/3647258548644742.

[4] https://www.youtube.com/watch?v=DHessyWYXqM at 5:00.

overwhelmed, the police line defending the entrance. *See* Exhibit 6 (Insurgence USA video).[5] Timbrook admitted that he saw police officers shooting pepper spray, and was pepper sprayed himself, during this time period. *See infra* at 23. Despite the violence Timbrook witnessed, he followed the crowd through the scaffolding entrance and up the interior stairs. The breach at the scaffolding entrance occurs approximately 30 seconds into Exhibit 6, and a still image taken from the video, included below as Exhibit 6-1, shows what appears to be Timbrook's distinctive orange hat as noted by a yellow arrow. Additionally, video taken from a different angle shows Timbrook in profile as rioters surge into the entrance. For example, at 8:42 in a documentary video by ITV news,[6] Timbrook can be seen hunched over and pouring water over his face, apparently after being pepper sprayed by police officers, while rioters stream up the scaffolding behind him. A still image of this video is included as Exhibit 7. Another short video taken from the entrance to the scaffolding shows Timbrook just before he joined rioters in moving up the stairs. A still image of this video is included below as Exhibit 8.[7]

---

[5] The Insurgence USA video was taken by John Earle Sullivan, who has been charged for his participation in the riot. The entire video was originally posted to https://www.youtube.com/watch?v=P34tO5eaLhg&t=1900, and is now available at https://www.dropbox.com/s/ijqdxbkpx5i5466/Full%20Video_%20The%20Seige%20On%20Uni ted%20States%20Capitol.mp4?dl=0. Timbrook appears frequently during the 1 hour and 26 minute runtime of the video. The government has included relevant clips of the video as exhibits to this memorandum.

[6] https://www.dropbox.com/s/6dpng0b74pxkd52/jJiSmVktty4.mp4?dl=0.

[7] https://twitter.com/SophieAlex1/status/1346925024876371970?s=20.



*Exhibit 6-1.*



*Exhibit 7.*



*Exhibit 8.*

Timbrook climbed to the top of the staircase inside the scaffolding, but his progress was briefly stopped by a third police line halfway up the Upper West Terrace Staircase. USCP closed circuit video (CCV) captured the subsequent assault by rioters on that line: the mob first pelted officers with various thrown the objects, and then suddenly surged forward pushing through the officers at 2:09:45 p.m. *See* Exhibit 9. Less than 20 seconds later, Timbrook moved past the collapsed line, as seen in a still image taken from the video, included below as Exhibit 9-1.



*Exhibit 9-1.*

Timbrook was also captured by the Insurgence USA video inside the scaffolding shortly before the police line was breached. *See* Exhibit 10. In the video a voice was recorded saying, "oh, they're going in," and Timbrook immediately turned to join the crowd surging toward the police line. A still image from the video is included below as Exhibit 10-1.



*Exhibit 10-1.*

After crossing the third police line, Timbrook ran into a fourth line of officers supported by metal barricades at the top of the Upper West Terrace Staircase. Rioters pulled and pushed on the barricades, and eventually collapsed the line by sheer weight of numbers. Once again, while there is no evidence that Timbrook personally assaulted any police officers, Timbrook was captured in the Insurgence USA video moving up the stairs toward the police line, and he crossed the line within 20 seconds of the breach. *See* Exhibit 11. A still image included below as Exhibit 11-1 shows Timbrook as he crossed the line and entered the Upper West Terrace.



*Exhibit 11-1.*

On the Upper West Terrace, while one part of the mob massed around the locked Senate Wing Door entrance to the Capitol Building, USP CCV captured Timbrook as he crossed to the North side of the Capitol looking for another way in. *See* Exhibit 12. Unable to find a way into the Capitol, Timbrook returned to the Senate Wing Door, which by that time had been broken open by rioters. *Id*. Timbrook was also captured in the Insurgence USA video as he approached and then entered the Senate Wing Door. *See* Exhibit 13. In the video, rioters jumped out of the Capitol through one of the broken-out windows, and discussed how police officers were shooting rubber

bullets at rioters inside the Capitol. Timbrook, undeterred, can be seen continuing forward to the Senate Wing Door in a still image from the video, included below as Exhibit 13-1.



*Exhibit 13-1.*

USCP CCV from inside the Capitol also captured the moment rioters broke through the windows next to the Senate Wing Door at approximately 2:13 p.m., and then kicked the Senate Wing Door open from the inside at 2:13:30 p.m. *See* Exhibit 14.  Timbrook entered through the Senate Wing Door at approximately 2:16 p.m., as seen in the still image included below as Exhibit 14-1.



*Exhibit 14-1.*

Once inside the Capitol, Timbrook turned to his left and then proceeded down a hallway toward the Senate Carriage Door. USCP CCV captured police officers directing rioters to exit the Capitol at the Senate Carriage Door as Timbrook approached. *See* Exhibit 15. A still image from the video is included below as Exhibit 15-1. Additionally, another rioter, Nolan Kidd, circled in red in Exhibit 15-1, captured the same moment on his mobile telephone.[8] In that recording, you can hear a rioter ask "why are they directing us" as officers try to move rioters toward the door. *See* Exhibit 16. Once it became clear that they were being led to an exit, Kidd and other rioters yelled "turn it around" to the crowd. *Id*. In the recording, Timbrook walked in front of Kidd as they approached the door, and then Timbrook stopped and moved to his right to avoid the exit. A still image from the video is included below as Exhibit 16-1.

---

[8] The video was collected from Kidd's mobile device that agents seized.  Kidd was charged in Case No. 21-cr-429-CRC, and pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G).  On May 9, 2022, Judge Cooper sentenced Kidd to 45 days' incarceration.



*Exhibit 15-1.*



*Exhibit 16-1.*

Although Timbrook did not follow the directions of law enforcement to exit at the Senate Carriage Door, he was also prevented from moving back through the Capitol by a police line that had formed behind him. As captured by the Insurgence USA video, a line of police officers repeatedly told rioters to "hold" and physically prevented rioters from moving further up the hallway. *See* Exhibit 17. When the police line finally broke under the weight of numbers, Timbrook was at the front of the line.  *Id*. at 2:21. Still images from the video, included below as Exhibits 17-1, 17-2, and 17-3, show a female officer moving against a wall as Timbrook rushes forward,[9] and also show Timbrook near the front of the crowd as rioters charge down the hallway. Timbrook was detained near the Senate Carriage Door for approximately 5 minutes before the police line was overrun.



*Exhibit 17-1.*

---

[9] While the video shows Timbrook in close proximity to the officer, it is not clear from the video that Timbrook actually collided with the officer. The Government has not found evidence that Mr. Timbrook personally assaulted a police officer.



*Exhibit 17-2.*



*Exhibit 17-3.*

Timbrook next made his way back past the Senate Wing Door and up a flight of stairs to the second floor.  He entered the Rotunda at approximately 2:25 p.m. He then proceeded to the East side of the Capitol towards the Columbus Door, where he watched a particularly brutal assault of police officers. For nearly two minutes Timbrook watched as officers struggled to keep the Columbus Door closed, while rioters pushed through an opening. *See* Exhibit 18. At one point an officer was knocked to the ground and appeared to suffer a significant injury. Timbrook moved

toward the fallen officer but did not appear to either attack or assist the fallen officer, who had to be carried to safety by another police officer. A still image from this video is included below as Exhibit 18-1. Following this assault, Timbrook spent another 13 minutes inside the Capitol.



*Exhibit 18-1.*

Timbrook next returned to the Rotunda and then moved to the Speaker's Hallway, where he spent approximately four minutes. *See* Exhibit 19. A still image included below as Exhibit 19-1 shows Timbrook entering an office, where he spent approximately one minute. The office is part of the suite of offices used by the Speaker of the House, and is a restricted access area not open to the public. *See also* ECF 34 at ¶ 9 (Timbrook admitted to being in "a staff office that he mistakenly believed to be Nancy Pelosi's office and threw some papers to the ground within the office"). By going down into the Speaker's Hallway instead of exiting the Capitol, Timbrook joined the mob that caused Congressional staffers to fear for their safety and seek shelter inside their officers.[10]

---

[10] https://www.washingtonpost.com/politics/inside-capitol-siege/2021/01/09/e3ad3274-5283-11eb-bda4-615aaefd0555_story.html



*Exhibit 19-1.*

After leaving the Speaker's Hallway, Timbrook walked down Statuary Hall at approximately 2:36 p.m., and then spent two minutes at the back of a large crowd gathered near the entrance to the Hall of the House of Representatives. Timbrook then returned through Statuary Hall and walked down a flight of stairs to the first floor. As depicted in the still image from USCP CCV included below as Exhibit 20, Timbrook exited the Capitol Building at the Memorial Door at approximately 2:40 p.m.



*Exhibit 16.*

*Timbrook's Statements Following the Riot*

Following the riot, Timbrook did not display any remorse regarding his illegal conduct. To the contrary, he posted messages on social media that downplayed the violence of other rioters and expressed pride in his participation. For example, Timbrook made the following statements in public posts and messages on Facebook on January 11, 2021:

- not trying to debate, just sick at how fast we Christians condemned the supposed inappropriateness when what we witnessed was an act of God for is he not sovereign? And were not an abnormally disproportionate number of praying Christians drawn to that place? All of us who went to DC that day are being shamed into silence by an utter misrepresentation coupled with a tremendous flat out lie. I'm sorry but I will neither be shamed nor silenced.

- such as when a bunch of people are caught up in an historic moment and take it upon themselves to back the cops, shout down violent speech, order strangers to not break things, maintain an atmosphere of calm during a crisis?

- I have been admonished, shamed, judged and condemned for participating in the most peaceful and orderly "riot" in world history. The only shame brought on that house came from within. In a courageous act of civil disobedience Ashli Babbit spilled here life for the cause of freedom and all y'all self righteous cowards have the gall to condemn the will of a million patriots? Thank you, [REDACTED], for standing for truth against a firestorm of lies.

- Fear is in condemning an act of patriotism and admonishing, even shaming, a million people who were glad to see citizens within shouting distance of a completely deaf house of governance. And to further denigrate the vast majority of maybe 500 people who dared to cross their sacred threshold while protecting cops, citizens, and property. Shame on all who say that an act of God must look somehow different, more civilized... while the enemy rapes our nation before our eyes. `

- Sorry friends and family, but I guess all y'all hate me now. I've been admonished, criticized, judged and condemned, for what I consider to be an act of patriotism, by the entire news media, celebrity class, political class, religious groups, hell everybody with a social media has weighed in and found us Guilty of violating the Sanctity of a public building. All the while for the past two generations that I know of, we've all been complaining about how crooked our government is and there's nothing we can do. Blah blah blah... I'm PROUD of everyone who went in there, even the 30 or so rowdy ones. Go ahead and ban me now because I have found my voice and am going to tell this story.

After he was interviewed by FBI agents, Timbrook continued to express no remorse for his illegal conduct, sending the following message via Facebook on February 9, 2021.

- First ever chat with the FBI today. To be honest, it comes as a relief. The agents were exemplary! Respectful, courteous, direct. My chastening is forthcoming, and will undoubtedly hurt my wallet, but I feel no remorse or shame.

*Law Enforcement Interview*

On February 9, 2021, Timbrook agreed to a voluntary interview with the FBI. In the interview, as reported by the FBI, Timbrook provided the following information:

- TIMBROOK advised he saw a big crowd headed towards the Capitol and also saw barricades. TIMBROOK advised he saw cops and one was by the fountain in front of the Capitol. TIMBROOK advised he heard people in the crowd saying this is the place to be stormed. TIMBROOK advised crowds kept coming up to the Capitol.

- TIMBROOK advised after this point he walked to some scaffolding by the Capitol, and he was looking at it because he was in construction and was curious if it was safe. TIMBROOK advised he parked himself there for about twenty (20) minutes. TIMBROOK advised while he was there, cops started shooting pepper spray towards the people, but it seemed the wind was blowing it back at the cops. TIMBROOK advised he did get pepper sprayed at one point by the scaffolding.

- TIMBROOK advised he then walked up a ramp entrance and saw windows broken. TIMBROOK advised it was at this point he entered the Capitol. TIMBROOK advised it seemed much like a tour group because everyone was staying between the ropes.

- TIMBROOK advised after entering the Capitol, he went up some stairs and saw a sign for Nancy Pelosi's office. TIMBROOK advised he then walked to a place near a spiral staircase. TIMBROOK advised a cop showed up and TIMBROOK advised he went the other way and into Nancy Pelosi's office. TIMBROOK advised it was the front part of her office and he saw a man with a podium. TIMBROOK advised he saw some hand sanitizer and he used it. TIMBROOK advised he threw some letters in Pelosi's office and then walked out. TIMBROOK advised he thought about taking something, but thought it would not be a good idea.

*The Charges and Plea Agreement*

On April 16, 2021, Timbrook was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. §§ 5104(e)(2)(C), (D) and (G), and was arrested on April 20, 2021. On May 14, 2021, Timbrook was charged by five-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(C), (D) and (G). On February 9, 2022, he pleaded guilty to Count Five of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Timbrook agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Timbrook now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Timbrook faces up to six months of imprisonment and a fine of up to $5,000. Timbrook must also pay restitution under the terms of

his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. Here, Timbrook was pepper sprayed and watched other rioters assault and push past police officers at defensive lines four times before he entered the Capitol Building. He was also part of the first wave who entered the Capitol, entering through the Senate Wing Door two and a half minutes after it was broken open, and he saw broken glass and

rioters climbing through windows when he entered. Clearly, Timbrook knew he was violating the law when he entered the Capitol Building. While no one who participated in the January 6 riot can plausibly claim to have been a tourist, Timbrook is certainly not among the least culpable of the rioters.

Additionally, while looking at Timbrook's individual conduct and determining a fair and just sentence, this Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Timbrook personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Timbrook's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Timbrook from most other misdemeanor defendants.

However, while Timbrook did not personally engage in violence, he repeatedly observed violence at close range before and after entering the Capitol Building. First, he watched as a rioters overwhelmed the police line protecting the entrance to the Capitol Grounds at the Peace Circle, the first breach of the Capitol's perimeter. Next, Timbrook watched as the mob collapsed a police

line at the entrance to the scaffolding by the Upper West Terrace Staircase. Once Timbrook made it inside the scaffolding, he stood near a third line of officers who were assaulted with thrown objects and then overrun by the mob. Upon hearing "they're going in," Timbrook turned and crossed the line within 20 seconds of the breach. Timbrook then watched as the mob collapsed a fourth police line at the top of the Upper West Terrace Staircase, where rioters pulled, pushed, and ultimately knocked over the metal barricades supporting the line. Once again Timbrook was near the front and crossed the line within 20 seconds of the breach. And all of this was after he was pepper sprayed and heard other rioters talking about storming the Capitol when he first entered the Capitol Grounds.

Additionally, once inside the Capitol Building, he ignored the directions of law enforcement, refusing to exit the Capitol Building at the Senate Carriage Door. Instead, he turned and faced off with another police line, and ignored their direction to hold in place. When rioters collapsed the line, Timbrook was right at the front, rushing past overwhelmed officers. Timbrook then climbed up to the second floor, where he watched rioters assault law enforcement officers and break through the Columbus Door. Despite watching an injured officer having to be carried away from the line, Timbrook spent another 13 minutes inside the Capitol. During that time, he spent time in a restricted, sensitive area, where he picked up documents and threw them on the ground.

Finally, long after the riot had ended, Timbrook felt no remorse regarding his illegal conduct. To the contrary, Timbrook repeatedly expressed pride in being part of the riot and having made it inside the Capitol. Even after being interviewed by the FBI, he wrote that he might suffer "hurt [to his] wallet," but still felt "no remorse or shame." Not only that, Timbrook repeatedly tried to downplay the violent conduct of other rioters, even though he personally watched numerous

26

assaults of police officers as rioters breached six different police lines. Despite that violence, Timbrook was "proud of everyone who went in" and said the rioters took it "upon themselves to back the cops, shout down violent speech, order strangers to not break things, [and] maintain an atmosphere of calm during a crisis."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Timbrook's History and Characteristics

As set forth in the Draft Presentence Investigation Report (PSR), Timbrook was born in 1965. PSR at ¶ 30. Timbrook is a high school graduate and attended one semester of college. PSR at ¶ 44. Timbrook is currently employed at a construction company in Tennessee. PSR at ¶ 46. Timbrook had one prior conviction for misdemeanor trespass from 1995. PSR at ¶ 24.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and Grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption

---

[11] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Timbrook's conduct on January 6, 2021, his public declarations of pride regarding that conduct, and the false information he spread about the riot demonstrate the need for specific deterrence for this defendant in the form of incarceration. Timbrook had received the clearest direction possible that he was trespassing, having been pepper sprayed by police before he ever entered the Capitol Building. Also, before entering the Capitol Building, Timbrook saw four separate mass assaults on police officers as they tried to hold defensive lines against rioters at different areas on the Capitol Grounds. While inside the Capitol, Timbrook ignored the direction of law enforcement, first refusing to exit at the Senate Carriage Door, and then helping rioters breach a police line despite repeated entreaties by officers to hold their position. He then watched the violent assault of law enforcement officers by the Columbus Door and went into a restricted, sensitive area in the Capitol Building. And after the riot, once he had a chance to reflect on the enormity of what had transpired, he demonstrated no recognition of wrongdoing. To the contrary,

he called the riot a "historic event" that was an "act of God." Timbrook even spread misinformation, claiming the rioters were "participating in the most peaceful and orderly 'riot' in world history" and claimed there were only "30 or so rowdy ones."

The government acknowledges that Timbrook has now accepted responsibility early by entering into this plea agreement. However, the government fears that Timbrook still does not fully comprehend the significance of his actions. Indeed, even after he was interviewed by FBI agents, Timbrook wrote "My chastening is forthcoming, and will undoubtedly hurt my wallet, but I feel no remorse or shame." Timbrook's insistence on entering the Capitol Building despite the violence he witnessed, combined with his lack of remorse and efforts to spread misinformation about the riot, warrants a sentence of incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[12] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[13] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr.

---

[12]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[13]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna*

6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, such as Timbrook, merit serious consideration of incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Timbrook has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a),

---

*Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the Court may want to consider the sentence imposed on Andrew Ericson (Case No. 21-cr-506 (TNM)). Like Timbrook, Ericson entered a restricted area (the Speaker's conference room). While Timbrook admitted he threw papers on the floor, Ericson posed for a picture with his feet on a table. Like Timbrook, Ericson appeared to have no remorse regarding his conduct. However, while there is video evidence documenting that Timbrook watched at least six breaches of police lines and numerous assaults on police officers, there was no such evidence in Ericson's case. Additionally, unlike Erickson, Timbrook was pepper sprayed by police before he entered the Capitol and did not comply with the directions of law enforcement

while inside the Capitol. This Court sentenced Erickson to 20 days of intermittent confinement as a condition of probation.

The Court may also want to consider the related cases of Erik Rau (Case No. 1:21-cr-00467(JEB)) and Derek Jancart (Case No. 1:21-cr-00148(JEB)). Both individuals pleaded guilty before Judge James E. Boasberg to violating 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. Like Timbrook, Rau made it inside a sensitive area (the Speaker's Lobby) while Jancart took photos from outside.  Also, all three spent significant time inside the Capitol Building, and spread propaganda on social media after the riot. Of course, there are differences as well. For example, unlike Timbrook, Jancart brought a gas mask to the riot, posted videos from the riot to social media, and had social media posts indicating a belief that a revolution.  However, Jancart did not participate in the breach of a police line, did not disobey police offer directions to exit the Capitol Building, and did not stay in the Capitol Building after watching the brutal assault of a police officer at the Columbus Door.  The Government requested four months' incarceration, and Judge Boasberg sentenced Rau and Jancart to 45 days of imprisonment.

More generally, the United States has recommended, and judges have often imposed, jail time in cases where the defendant either witnessed confrontations with law enforcement or refused to follow the directions of law enforcement. *See, e.g.*, *United States v. Register*, 1:21-cr-00349 (TJK) (sentenced to 75 days incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows and over smashed glass, and ignored officers' attempts to clear him and others from the building, and witnessed violence); *United States v. Frank Scavo*, 1:21-cr-254 (RCL) (sentenced to 60 days' incarceration where the defendant witnessed the violent breach of the East Rotunda Doors); *United States v. James Little*, 1:21-cr-315 (RCL) (sentenced to 60 days' incarceration and 36 months' probation where the defendant witnessed

rioters clashing with police officers on the Capitol Grounds); *United States v. William Tryon*, 1:21-cr-00420 (RBW) (sentenced to 50 days incarceration where the defendant initially disregarded directions by police officers and remained inside the Capitol until he was forced to leave).

Additionally, courts have generally imposed sentences of incarceration where defendants gained entry to restricted access locations inside of the Capitol Building. *See, e.g.*, *United States v. Mazzocco*, 1:21-cr-54 (TSC) (sentenced to 45 days of incarceration where defendant entered conference room area known as Spouse's Lounge); *United States v. Pham*, 1:21-cr-109 (TJK) (sentenced to 45 days of incarceration where defendant walked into office area with desks, a computer, and numerous paper files); *United States v. Bonet*, 1:21-cr-121 (EGS) (sentenced to 90 days of incarceration where defendant smoked marijuana in Senator's private office); *but see United States v. Marquez*, 1:21-cr-136 (RBC) (government requested four months of incarceration for defendant who entered Senator Merkley's office; sentenced to 18 months' probation, citing mental health issues).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. Apr. 21, 2022) (imposing a split sentence); *United States v. Sarko*, 1:21-CR-00591-CKK (D.D.C. April 29, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[14] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[15]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

---

[14] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

[15] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1,

Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term

of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[16]

### A. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[16] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[17]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Timbrook to ninety days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future

---

[17] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      /s/ *Benjamin Kringer*
Benjamin E. Kringer
Detailed to the U.S. Attorney's Office
for the District of Columbia
D.C. Bar No. 482852
555 Fourth Street, N.W.
Washington, DC  20530
benjamin.kringer2@usdoj.gov
(202) 598-0687