```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      * * * * * * * * * * * * * * *    )
 3    UNITED STATES OF AMERICA,        )      Criminal Action
                                       )        No. 21-00361
 4                    Plaintiff,       )
                                       )
 5       vs.                           )
                                       )
 6    MICHAEL TIMBROOK,                )      Washington, D.C.
                                       )      May 20, 2022
 7                    Defendant.       )      9:07 a.m.
                                       )
 8    * * * * * * * * * * * * * * *    )

 9

10                 TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                  UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14    FOR THE GOVERNMENT:      BENJAMIN E. KRINGER, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
15                               FOR THE DISTRICT OF COLUMBIA
                               555 Fourth Street, Northwest
16                             Eleventh Floor
                               Washington, D.C. 20530
17
      FOR THE DEFENDANT:       MARIA JACOB, ESQ.
18                             OFFICE OF THE FEDERAL PUBLIC
                                 DEFENDER
19                             625 Indiana Avenue, Northwest
                               Suite 550
20                             Washington, D.C. 20004

21    FOR U.S. PROBATION:      SHERRY BAKER

22    REPORTED BY:             LISA EDWARDS, RDR, CRR
                               Official Court Reporter
23                             United States District Court for the
                                 District of Columbia
24                             333 Constitution Avenue, Northwest
                               Room 6706
25                             Washington, D.C. 20001
                               (202) 354-3269
```

1          THE COURTROOM DEPUTY:  This is Criminal Case

2     21-361, the United States of America versus Michael

3     Timbrook.

4          From Probation, Officer Sherry Baker.

5          Counsel, please come forward to identify

6     yourselves for the record, starting with the Government.

7          MR. KRINGER:  Good morning, your Honor.  Benjamin

8     Kringer on behalf of the Government.

9          THE COURT:  Good morning, Mr. Kringer.

10          MS. JACOB:  Good morning, your Honor.  Maria Jacob

11     appearing on behalf of Mr. Timbrook, who is present here.

12          THE COURT:  Good morning, Ms. Jacob.

13          Good morning, Mr. Timbrook.

14          We're here for the sentencing of the Defendant,

15     Michael Timbrook, who's pleaded guilty to one count of

16     parading, demonstrating or picketing in a Capitol building

17     in violation of 40 USC 5104.

18          I've received and reviewed the presentence

19     investigation report and sentencing recommendation from the

20     probation office as well as the sentencing memoranda and

21     exhibits from both the Government and Mr. Timbrook.

22          Are there any other documents or materials that I

23     should have reviewed?  Mr. Kringer?

24          MR. KRINGER:  Nothing from the Government, your

25     Honor.

1          THE COURT:  And Ms. Jacob?

2          You can just stand there, actually, folks, for

3     these.

4          MS. JACOB:  No, your Honor.  Nothing further.

5          THE COURT:  And I should say, in light of the

6     guidance from the CDC, I do not require people to wear masks

7     in my courtroom.  You, of course, are welcome to do so if

8     you wish to.

9          Mr. Timbrook, this sentencing hearing will proceed

10    in three steps, some of which may seem a bit mechanical to

11    you.  But I want to keep in mind why we are here today and

12    the gravity of the situation.  You've committed a federal

13    crime.  Today's proceeding is a serious matter as it is

14    about the consequences that you will face because of your

15    decision to engage in criminal behavior in violation of

16    federal law.

17         The first step of today's hearing is for me to

18    determine whether you've reviewed the presentence report and

19    whether there are any outstanding objections to it and, if

20    so, to resolve those objections.

21         The second step is to hear from the Government,

22    from your counsel and from you, sir, if you wish to be heard

23    about sentencing in this case.

24         And the final step requires the Court to fashion a

25    just and fair sentence in light of the factors Congress set

1      forth in 18 USC 3553(a).

2              As part of this last step, the Court will actually

3      impose the sentence along with the other required

4      consequences of the offense.

5              So turning to that first step now, the final

6      presentence investigation report was filed on May 13th,

7      2022.  The probation office filed its final sentencing

8      recommendation on the same day.

9              Does the Government have any objection to any of

10     the factual determinations set forth in the presentence

11     report?  Mr. Kringer?

12             MR. KRINGER:  No, your Honor.

13             THE COURT:  And, Ms. Jacob, have you and

14     Mr. Timbrook read and discussed the presentence report?

15             MS. JACOB:  Yes, we have.

16             THE COURT:  Does the Defendant have any objections

17     to any of the factual statements set forth in it?

18             MS. JACOB:  No, your Honor.

19             THE COURT:  Mr. Timbrook, could you come to the

20     podium, sir.

21             THE DEFENDANT:  (Complies.)

22             THE COURT:  Sir, are you fully satisfied with the

23     services of your attorney in this case?

24             THE DEFENDANT:  Yes, I am, your Honor.

25             THE COURT:  Do you feel you've had enough time to

```
1    talk with her about the probation office's presence

2    report and the papers the Government filed in connection

3    with sentencing?

4              THE DEFENDANT:  Yes, I have, your Honor.

5              THE COURT:  Thank you, sir.  You may have a seat.

6              The Court will accept the facts as stated in the

7    presentence report.  The presentence report will serve as my

8    findings of fact for purposes of this sentencing.  And I'd

9    like to thank Officer Baker for her work on this matter.

10             The sentencing guidelines do not apply because

11   this crime is a Class B misdemeanor.  I'll now discuss the

12   remaining applicable penalties.  The maximum jail term the

13   Court may impose for this offense is six months.  The

14   maximum fine the Court may impose for the offense is $5,000.

15   There's also a mandatory special assessment of $10 under 18

16   USC 3013.

17             Under 18 USC 3561, Mr. Timbrook is eligible for up

18   to five years of probation because the offense is a

19   misdemeanor; and under the parties' plea agreement, the

20   Court shall order restitution in the amount of $500.

21             Have I accurately stated the statutory framework

22   under which we are operating in regard to this case?

23   Mr. Kringer?

24             MR. KRINGER:  Yes, your Honor.

25             THE COURT:  And Ms. Jacob?
```

1          MS. JACOB:  Yes, your Honor.

2          THE COURT:  Before I discuss the other sentencing

3     factors that will bear on my final decision, I will at this

4     point share with the parties the particular sentence the

5     probation office has recommended, taking into account the

6     advisory guidelines sentence, the available sentence and all

7     of the factors listed in Section 3553(a).  The probation

8     office has recommended a sentence of 14 days' incarceration,

9     no probation, restitution in the amount of $500 and a

10    special assessment of $10.

11         The recommendation of the probation office is

12    based solely on the facts and circumstances contained in the

13    presentence report.

14         I must now consider the relevant factors that

15    Congress set out in 3553(a) to ensure that the Court imposes

16    a sentence that is sufficient but not greater than necessary

17    to comply with the purposes of sentencing.  These purposes

18    include the need for the sentence imposed to reflect the

19    seriousness of the offense, to promote respect for the law

20    and to provide just punishment for the offense.

21         The sentence should also afford adequate

22    deterrence to criminal conduct, protect the public from

23    future crimes of the Defendant and promote rehabilitation.

24         In addition to the guidelines and policy

25    statements, I must consider the nature and circumstances of

1    the offense, the history and characteristics of the

2    Defendant, the need for the sentence imposed, the guideline

3    ranges, the need to avoid unwarranted sentence disparities

4    among defendants with similar records who have been found

5    guilty of similar conduct and the types of sentences

6    available.

7          Does the Government wish to be heard on the

8    application of the factors set forth in 3553(a), request a

9    variance or otherwise make a sentence recommendation?

10         MR. KRINGER:  Yes, your Honor.  Thank you.

11         When looking at the specific factors and the

12   conduct of Mr. Timbrook on January 6th, there are numerous

13   factors that led the Government to recommend a sentence of

14   90 days' incarceration in this case.

15         Since they are described in detail in our

16   memorandum, I will touch on them briefly here.

17         Starting at the beginning, Mr. Timbrook knew as he

18   headed towards the Capitol before he entered the grounds

19   there was a risk of violence.  As he has admitted, he joined

20   a crowd where people were discussing storming the Capitol on

21   that day.

22         Mr. Timbrook then observed from close proximity

23   four different breaches of police lines and assaults of

24   police officers before he entered the Capitol.  He also was

25   teargassed by law enforcement before entering the Capitol.

1          Therefore, Mr. Timbrook, unlike other defendants,

2    has no argument that he thought he had the right to be

3    there.

4          It is also important to note that Mr. Timbrook was

5    part of the first wave to enter the Capitol.  Entering

6    through the Senate wing door two and a half minutes after it

7    was broken open by rioters, and in fact he was on the Upper

8    West Terrace before that door was broken open, trying to

9    find another way in as the rioters massed around that door

10   and then coming back to that door once it was broken open to

11   enter.

12         And as he entered, he saw the Senate fire door

13   broken open by rioters and saw rioters climbing through

14   broken-out windows.

15         Once again, Mr. Timbrook knew he did not have the

16   right to enter the Capitol.

17         Once inside the Capitol, Mr. Timbrook was almost

18   immediately directed to exit out the Senate carriage door.

19   But he didn't do so.  He turned around but was stopped by a

20   new line of police officers.

21         For five minutes, he stayed by the Senate carriage

22   door, not exiting.  And when rioters finally forced through

23   that police line, where was Mr. Timbrook?  At the front.

24   There was no one in between him and an officer backed

25   against a wall, and then one of the leaders of the crowd

1    moving through the hallway as police officers backpedaled,

2    trying to stay in front.

3              Mr. Timbrook then went to the Columbus door, where

4    he spent two minutes watching a very violent assault of

5    police officers as rioters tried to breach and enter through

6    the Columbus door.  And I believe your Honor's requested

7    that I show it.  It's a brief scene.  The Court's

8    indulgence.

9              (Whereupon, segments of Government's Exhibit No.

10   18 were published in open court.)

11             THE COURT:  That's the Defendant in the orange

12   hat?

13             MR. KRINGER:  That is correct, your Honor.

14             As defense counsel notes, Mr. Timbrook does pick

15   up a sign.

16             You see the police officer being thrown down there

17   at the top of the screen.  Would you like me to replay that?

18             THE COURT:  I saw it, sir.

19             (Whereupon, segments of Government's Exhibit No.

20   18 were published in open court.)

21             THE COURT:  Was that the part you wanted me to

22   see?

23             MR. KRINGER:  Yes, your Honor.

24             THE COURT:  I'll tell you, I certainly agree with

25   you.  It's a serious assault.  It's a little hard for me to

1    tell what Mr. Timbrook is doing there.  I mean, I could

2    certainly imagine he's telling people, "Step back, get away

3    from him," that type of thing.

4         I think to the extent you're saying he knew bad

5    things were happening and should have gotten out, I

6    completely agree with you there.

7         MR. KRINGER:  Understood, your Honor.

8         The Government doesn't want to get bogged down on

9    this issue.  The Government is willing to accept -- sorry.

10   The Government does not try to say that Mr. Timbrook went

11   there with the intention of hurting the officer, as we made

12   clear in the memorandum.  And to the extent the Court

13   credits that Mr. Timbrook intended or wanted to offer help

14   if it was needed, that is fine.

15        THE COURT:  I don't know.

16        MR. KRINGER:  The video shows what the video

17   shows, which is no actual assistance.

18        THE COURT:  Okay.

19        MR. KRINGER:  Thank you, your Honor.

20        THE COURT:  I take your point.

21        MR. KRINGER:  After watching this breach,

22   Mr. Timbrook's sixth breach, and watching an injured officer

23   being dragged away, Mr. Timbrook stayed in the Capitol for

24   13 more minutes and went into the Speaker's suite and went

25   into one of the offices in the Speaker's suite.

 1          And finally, once Mr. Timbrook actually left the

 2     Capitol, four days later, five days later, Mr. Timbrook is

 3     online saying he has no remorse, saying he's proud of the

 4     rioters, numerous Facebook posts, where he falsely claims

 5     the riot was orderly and peaceful and, despite the six

 6     breaches he watched, says that there were at most 30 rowdy

 7     rioters.

 8          Now, mitigation:  Mr. Timbrook does not have --

 9          THE COURT:  That he was proud of that?

10          MR. KRINGER:  And he was proud of that.  Correct,

11     you were.  That he was proud of the rioters, proud of his

12     own conduct.  That's what he puts in his Facebook posts.

13          Now, mitigation:  Mr. Timbrook does not have a

14     relevant criminal history.  Mr. Timbrook voluntarily met

15     with the FBI and was generally honest in that meeting.  And

16     Mr. Timbrook has now accepted criminal responsibility in

17     entering this plea.  But the Government would like to note

18     there is a difference between accepting criminal

19     responsibility because you believe you are criminally

20     culpable to get the lowest possible sentence and being

21     remorseful and believing you did wrong.

22          And the Government reminds this Court that,

23     following his FBI interview, more than a month after the

24     riot, Mr. Timbrook wrote:  I am not remorseful.  I am not

25     shameful.  And he wrote that he believed his criminal

1    conduct was worthy of only a fine.

2          Despite all of these factors, the defense has

3    requested a probation-only sentence in this case and, in

4    support, tries to compare Mr. Timbrook to the case of

5    Danielle Doyle, 21-CR-324, who this Court sentenced to

6    probation only.

7          And there are some similarities, your Honor.  They

8    both entered through the Senate wing door and they both

9    spent around 25 minutes inside the Capitol.

10          And in fairness, Ms. Doyle has some additional

11    aggravating factors.  She apparently said something to a

12    police officer, although the Government introduced no

13    evidence as to what, if anything, was actually said.  And

14    she posted -- she took photos from the Capitol.

15          However, Ms. Doyle did not march in a crowd where

16    they discussed storming the Capitol.  She did not witness

17    four breaches before entering the Capitol.  She was not

18    pepper-sprayed before entering the Capitol.  She did not

19    disregard directions to leave the Capitol while inside.  She

20    was not part of the first wave into the Capitol.  She did

21    not watch two additional assaults of police officers inside

22    the Capitol.  And she did not go into the Speaker's suite.

23          Mr. Timbrook has far more and far more serious

24    aggravating factors than Ms. Doyle.

25          Both the Government and the defense also point to

1    the case of Mr. Ericson, 21-CR-506, whom this Court

2    sentenced to 20 days of intermittent incarceration.  And

3    again, similarities, your Honor:  Mr. Ericson went inside

4    the Speaker's suite and both Mr. Ericson and Mr. Timbrook

5    engaged in bad behavior inside that suite.  And some of

6    Mr. Ericson's conduct was worse.  He took photos of

7    himself, posted them online with his feet up on a conference

8    table.  And he also, I believe, was less helpful to law

9    enforcement in his initial interview.

10                THE COURT:  He also had problems in pretrial

11   release.

12                MR. KRINGER:  I believe he missed one call, but it

13   might be more, your Honor.  It's your case.  There are

14   additional factors.

15                But again, there are differences as well.

16   Mr. Ericson, I believe the evidence indicated he may have

17   seen one assault, but there was no actual evidence of it.

18   It was kind of we assume he did, whereas with Mr. Timbrook,

19   there was video evidence of him by six different law

20   enforcement assaults.

21                Mr. Ericson also was not pepper-sprayed before

22   entering the Capitol.  He did not disregard the directions

23   of law enforcement to leave the Capitol.  And again, he did

24   not hear rioters talking about storming the Capitol prior to

25   entering the building.

1          Also, I think your Honor took into consideration

2    Mr. Ericson's relative youth and inexperience in sentencing

3    him to 20 days' incarceration.

4          Now, while it is not surprising that the

5    Government and defense counsel have disagreed regarding an

6    appropriate sentence in this case, the Government wants to

7    make a few points regarding the memorandum provided by the

8    defense for clarification.

9          First, the defense wrongly suggests that a 90-day

10   sentence for a 5104 charge would be the harshest sentence

11   ever given and only given once.  There were two cases where

12   defendants were incarcerated for six months.  Admittedly, it

13   involved cases where time served was issued, but six months.

14   Those cases are *U.S. v. Curzio*, 21-CR-41, and *U.S. v.*

15   *Dresch*, 21-CR-71.  There are additional four cases where a

16   defendant who pled to 5104 was given 90 days, not just one.

17   And there are two other misdemeanor cases where a defendant

18   received 90 days' incarceration.

19          Second, the defense argues that the Defendant did

20   not himself assault officers or damage property and that

21   these are mitigating factors.

22          The Government's position is that these are

23   important facts, but they're not mitigating.  If the

24   Defendant -- these are elements of a different offense.  If

25   the Defendant had struck an officer or had broken the Senate

1    wing door open himself, he would not be here today pleading

2    to a 5104 charge.

3            Not surprisingly, the defense has failed to cite a

4    single case where a defendant was accused of assault or

5    broken property and pled to a misdemeanor.  The cases cited

6    talk about shouting.  They talk about, you know, bad

7    behavior.  But the Government notes that no court -- that's

8    just one aggravating factor.  And no court has required

9    shouting for a sentence of incarceration.

10           And this kind of aggressive behavior, the

11   Government believes it is in this case as well.  The

12   Government would describe Mr. Timbrook's behavior by the

13   Senate carriage door as aggressive, again, front of the

14   line, nobody between him and an officer, backed up against

15   the wall, front of the line moving down the hallway while

16   officers are backpedaling either trying to get out of the

17   way or trying to slow people down.

18           Whether this Court considers that as bad as

19   shouting, it is certainly aggressive.

20           Third, the defense did not address -- and this

21   appears to give little credence to the fact -- sorry --

22   little weight to the six different police breaches and

23   assaults of police officers the Defendant witnessed.  That's

24   not really addressed in the memorandum.  The Government

25   wants to make it clear:  These are very serious factors to

1       the Government in recommending 90 days.

2               Each instance was a point in time where the

3       Defendant should have stopped, should have realized this was

4       not a peaceful protest.  This was not a political rally.

5       And the fact that after that sixth protest -- sixth breach

6       the Defendant then stayed in the Capitol and went into the

7       Speaker's suite of offices, a sensitive, restricted area, is

8       an indication he did not recognize the import of what he was

9       seeing and the violence being conducted on officers.

10              And finally, talking about the Speaker's suite

11      again, it appears the defense gives little weight to his

12      entrance into the Speaker's suite of offices.  The

13      Government agrees with this Court in the *Ericson* case where

14      this Court described how staffers were barricading

15      themselves in offices, terrified of what was going on around

16      them, and appeared to agree with the other courts of this

17      district who have found that entering into that sensitive

18      restricted area warrants a sentence of incarceration.

19              So in conclusion, defendants who have engaged in

20      conduct similar to that of the Defendant have received

21      incarceration.  And looking at all of Mr. Timbrook's many

22      aggravating factors, the Government recommends a 90-day

23      sentence of incarceration.

24              Thank you.

25              THE COURT:  Thank you, Mr. Kringer.

1          Ms. Jacob, do you wish to be heard on the

2    application of factors set forth in 3553(a), request a

3    variance or otherwise make a sentencing recommendation?

4          MS. JACOB:  Yes, your Honor.

5          THE COURT:  I guess a variance isn't really

6    relevant.

7          MS. JACOB:  Your Honor, I'd like to first

8    introduce Mr. Timbrook's wife, who is here.  This is Nancy

9    Timbrook.

10          THE COURT:  Welcome, ma'am.

11          MS. JACOB:  They've traveled from Tennessee to be

12    here today.

13          Your Honor, probation, even despite everything

14    that the Government has just mentioned, which Mr. Timbrook

15    truly does acknowledge the severity, we still think that

16    probation is the appropriate outcome here, considering all

17    the 3553(a) factors.

18          Mr. Timbrook, he did accept responsibility for his

19    role on January 6th.  He pled guilty to a petty offense:

20    parading, picketing in a U.S. building.  On that day -- I

21    completely disagree with the Government as they characterize

22    his conduct as aggressive.  When I review the videos and

23    when I look at the facts of the case, I think that he's one

24    of the, actually, rare individuals who didn't display an

25    ounce of aggression, whether it be in the form of yelling at

1    an officer or cheering or, you know, encouraging the crowd.

2    He just simply didn't do that.  He was peaceful the entire

3    time.

4            And I understand it is an aggravating factor that

5    he did watch nonpeaceful events occurring.  However, he

6    himself was peaceful.  And I do think that that is something

7    to be considered.

8            He followed the crowd through the Capitol grounds

9    and ultimately into the building.  And, you know, the way --

10   and I understand the Court viewing the video today,

11   Government's Exhibit 18, simply just cannot determine what

12   the actions were.  But in conversations with Mr. Timbrook --

13   and Mr. Timbrook, you'll hear from him soon -- he was, his

14   intention was, to try to stand in the way so that no further

15   harm would come to that officer.

16           And I think that him picking up that sign is a

17   show of respect for the property inside of the building.  He

18   was -- you know, he will tell the Court later that he wishes

19   that he had done more.  But I don't think that that should

20   be an aggravating factor, as the Government is suggesting.

21           Your Honor, he left the building 25 minutes later,

22   drove straight home to Tennessee.  He provided a voluntary,

23   brutally honest interview to the FBI where he actually

24   provided even more details than the Government would have

25   ultimately learned.  And I think that's important.  He's

1    never, ever tried to hide behind his conduct.

2            Your Honor, just a response to a couple of the

3    points that the Government brought up today:  They focus a

4    lot on, you know, him being teargassed.  And I think as your

5    Honor has seen videos in, you know, multiple cases thus far,

6    I think you know there's a difference between being

7    teargassed or Maced in direct response to an officer's

8    commands or noncompliance with an officer's commands and

9    being teargassed because everybody is kind of in the line of

10   fire of everybody else being teargassed.  I think that's an

11   important point to distinguish.

12           Your Honor, he was never directly asked to exit.

13   And I know that of course we acknowledge that that is an

14   aggravating factor, that he could have.  He had the

15   opportunity to leave and did not leave.  However, he was

16   never directly told by a police officer to leave.

17           And I know that the police officers could not --

18   you know, they couldn't go up to every single person and

19   tell every person, "You have to leave."  And there were

20   clear indications that he should have left.  The officers

21   were funneling people out of the exit.  And instead of

22   Mr. Timbrook going to the right, he went to the left.  And

23   so he acknowledges that as an aggravating factor, but it

24   is -- can be distinguished from cases where individuals were

25   actually directly asked to leave.

1          THE COURT:  So I guess I'm a little confused.  I

2     thought I remembered that being part of the offense conduct.

3     Are you saying he wasn't individually asked to leave, but --

4          MS. JACOB:  That's right.

5          THE COURT:  -- the police officers were telling

6     the group to leave?

7          MS. JACOB:  That's right.  So one of the

8     Government's exhibits -- I'm sorry; I don't have the actual

9     number -- but it must have been one of the earlier

10    Government exhibits that show police officers funneling

11    people to the exit where there's kind of like a security

12    area.  And Mr. Timbrook is seen in the hallway and he's, you

13    know -- although I don't pretend to know his intentions and

14    thoughts at that very moment, presumably you would imagine

15    he would see that and understand that that's an officer's

16    attempt to get people to leave.

17         But he was never actually funneled himself and he

18    was never directly asked to leave.  And I think that's

19    important.

20         THE COURT:  I see what you're saying.  Okay.

21         MS. JACOB:  Your Honor, as far as the Facebook

22    posts that the Government relies on to suggest that he has

23    no remorse, Mr. Timbrook will tell the Court today that he

24    was not proud and is not proud of his conduct.  That was

25    written in response to a lot of criticism that he was

1    receiving.  He is a human being and he was receiving brutal

2    and just horrific comments from not only the media, but from

3    random people from the public who he didn't even know, one

4    person even saying "I hope you die in prison."

5           I mean, a human being -- I mean, I can certainly

6    understand that you would lash out, you know, presumably.

7    Ideally he wouldn't have done that.  But at least it's

8    somewhat relatable that in a moment of frustration and just

9    being simply hurt that one would try to defend themselves.

10          He is not proud, and he will tell you that he's

11   not proud of his conduct.

12          I also disagree with the Government's approach

13   that if one person doesn't express remorse, you know, right

14   away, then they can never express remorse and it's sort of a

15   one-shot deal.  I just don't think that that's how human

16   nature works  and I don't think that that's how it's been

17   approached in other types of cases that are not January 6

18   cases.

19          I think that when people first learn that they had

20   done something wrong, their instinct is to defend

21   themselves.  Ideally, that wouldn't be the case.  But that

22   happens.  And that doesn't mean that he's not remorseful now

23   and it doesn't mean that he was not remorseful shortly

24   thereafter.  He distanced himself completely after he made

25   those comments.  And he even did make a comment that -- you

1    know, in support of the police officers that day, as you'll

2    hear him later say to the Court today.

3            Mr. Timbrook is a hardworking, dedicated husband.

4    He's 57 years old.  For his entire life he's been focused on

5    taking care of his family.  He's been married for 24 years

6    and he, you know, very sincerely told Probation that Nancy

7    is the best thing that's ever happened to him.  They are a

8    team.  They work in tandem and even -- she's been a huge

9    support for him throughout this whole process.

10           He's been working full-time in construction.  It

11   requires manual labor.  It's not easy, but he does enjoy it

12   and he has found a passion in it.

13           He works hard to provide a stable income and his

14   wife does work.  However, his income -- their family does

15   rely on Mr. Timbrook's income.  And so a period of

16   incarceration would compromise his ability to provide for

17   his family.  He's been perfect on pretrial release, so I

18   think that's a good indication that he will not violate the

19   orders of the Court.

20           There are actually a couple collateral

21   consequences.  I didn't stress -- I would like to emphasize

22   more today -- I mentioned that he has sleep apnea.  But I

23   wanted to mention to the Court that there are -- I don't

24   know if the Court is familiar with the CPAP machine that

25   people have to wear when they have severe sleep apnea.  His

1    is severe.  His is on the most severe end of the spectrum.

2    If he doesn't have that machine, he can suffer stroke, heart

3    attack.  So of course that would provide a logistical

4    difficulty for the jail to be able to accommodate that.

5            Specific deterrence, I would submit, has already

6    been served here.  For a petty offense, he's already

7    received heavy scrutiny from the media and from the public.

8            He's been on pretrial supervision for over a year

9    now, which is, you know -- I mean, of course it's a great

10   opportunity by the Court, but it is also a restriction of

11   liberty.  There's responsibilities that come with it.  And

12   he's done well.  He's shown the Court that he can do well.

13           And, your Honor, just to respond briefly to some

14   of the distinctions that the Government tried to make with

15   the other cases where, you know, the Court did give

16   probation and ultimately the *Ericson* case, where the Court

17   decided that intermittent confinement was appropriate:  I do

18   think while Mr. Ericson was young in age, I actually also

19   think that that -- someone at the age of 57, I think that is

20   also kind of a mitigating factor to consider, because he's

21   gone 57 years with almost no criminal history.  He has one

22   very petty offense from 27 years ago.  And so I do think

23   that that shows that his risk of recidivism is extremely low

24   here, almost nonexistent.

25           He also, you know, did not, as the Government

1   alleged, you know, disrespect the Capitol Building by

2   putting his feet up on a desk while drinking beer.  I think

3   that is an extremely aggravating factor.  Mr. Timbrook, he

4   did not cheer.  And so, you know, I also think that's

5   another aggravating factor.  He was quiet.  He was peaceful

6   the entire time.

7           For all those reasons, your Honor -- and

8   Mr. Timbrook does want to address the Court.  For all those

9   reasons, we do think a probationary sentence would

10  accomplish the goals of sentencing here.

11          THE COURT:  Thank you, Ms. Jacob.

12          Mr. Timbrook, you have the right to make a

13  statement or present any information to mitigate the

14  sentence.  Would you like to say anything that you would

15  like me to consider before imposing sentence, sir?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  If you could approach the podium, sir.

18          THE DEFENDANT:  Your Honor, I agree with my

19  lawyer's statement that the Facebook posts that talk about

20  being pride -- being proud and not remorseful was hyperbole.

21  I do indeed regret that statement.  But more importantly,

22  sir, I regret anything that I either did or lacked the

23  courage to not do or should I say lacked the courage to do

24  that interfered with the police officers during their duty.

25  I'm quite ashamed of that.  As I've always supported the

1   working class and whatever their role is, in particular the

2   police and security.  It's not in my nature to be

3   disobedient in that way.

4        I can only say that during the time of the riot

5   that there was obviously an extraordinary amount of chaos.

6   And in several instances when I encountered police officers

7   in distress, while I didn't place my hands on any of the

8   other people that were, you know, in the process of hurting

9   them, I did put myself in between the police officers and

10   the crowd.  As a matter of fact, with regards to the whole

11   pepper spray, that's how much I got sprayed, was putting

12   myself in between a cloud of pepper spray and a pair of

13   police officers who were standing on the line who I helped

14   keep the barricade in place.

15        As far as the fact of me being apparently in so

16   many places where breaches occurred, at the time I was

17   completely unaware of the scope and regret most poignantly,

18   your Honor, anything that I lacked the courage to do.

19        I would like to point out, sir, that the video

20   that showed me picking that thing up off the ground, there

21   was a reason why I was standing there, because the police

22   officer that was ultimately injured was in distress as his

23   firearm was dangling almost to the ground.  And when the

24   rioter was trying to push him way in, his hand brushed up

25   against the officer's weapon.  And when the officer hit the

1    ground, I placed myself in between him and the crowd in the

2    hopes of preventing him from firing his weapon into the

3    crowd and not so much as a matter of protecting the crowd,

4    sir, but from protecting him from having to live with such

5    an act.  I feel that he would have regretted it.

6           As far as the debt that I'm going to be required

7    to pay to society for my actions, your Honor, I want you to

8    know that I fully respect the decision that you have to

9    make, and whatever decision you make I will comply

10   wholeheartedly and with the intention of ultimately putting

11   this whole thing behind me and burrowing into my little

12   hillside in Tennessee and finishing up what few years I have

13   left.

14          Thank you for your time and for your tough job

15   you've got, sir.

16          THE COURT:  Thank you, Mr. Timbrook.

17          Sir, you can remain at the podium.

18          Sir, I've assessed the particular facts of this

19   case in light of the relevant 3553(a) factors and I now want

20   to provide remarks for the record and for you, sir, about my

21   considerations in regard to the nature of your offense and

22   your history and characteristics.

23          Sir, you participated in a shameful event, a

24   national embarrassment that made us all feel less safe, less

25   confident that our country can be ruled democratically

1    rather than by mob rule.  As compared with the other January

2    6th misdemeanants who I've sentenced to date, I agree with

3    the Government that your conduct stands out really more on

4    the aggravated end.

5         First, I do take very seriously that you entered

6    the Speaker's office.  That is a private area, and your

7    violation of that space does suggest a certain brazenness

8    and intentionality that requires consideration in your

9    sentence.

10        You also could have caused a very dangerous and

11   fearful scene had the Speaker or her staff still been

12   present in the office when you and others entered it.  There

13   have been numerous records of Hill staffers cowering behind

14   locked doors and under desks, afraid that rioters like you,

15   who were roaming the halls, might find them.

16        Your admission to throwing around papers there

17   underlines what I take as a wanton disrespect that you

18   showed to the U.S. Capitol and our nation's leaders.  Of

19   course there's nothing wrong with protesting or disagreeing

20   with our nation's leaders and their decisions.  That's a

21   right enshrined in the First Amendment.

22        But breaking into the Capitol and into private

23   offices is something completely different.  And I think your

24   actions on January 6th go beyond the pale.

25        Second, I agree with the Government that your

1   entry into the Capitol, despite seeing officers battle

2   rioters in your immediate vicinity, trying to prevent them

3   from entering, is an aggravating factor.  It highlights your

4   knowledge of the dangerousness of the situation and makes

5   your decision to continue into the Capitol all the more

6   disturbing.  You saw fights; you saw doors being broken;

7   officers were trying to direct people to leave.  You don't

8   leave.  I think those are all aggravating factors.

9           And finally, I agree with the Government that your

10  online statements about being proud of your actions and the

11  actions of what you called the rowdy ones suggests a lack of

12  remorse.  While it wouldn't have been apparent to everyone

13  who was on the Capitol grounds on January 6th, you knew from

14  what you'd seen that officers were getting injured, that

15  people were breaking windows, that lawful protest had turned

16  into a violent riot.  You asserted yourself with those bad

17  actors, and it's hard for me not to associate you with them

18  in sentencing.

19          As an aside and while this has nothing to do with

20  my considerations in regard to an appropriate sentence, I

21  must say how disappointing your online comments invoking God

22  and your faith were, as if your conduct on January 6th was

23  somehow justified.

24          Romans -- the Book of Romans says:  Let every

25  person be subject to the governing authorities, for there is

1    no authority except from God, and those who exist have been

2    instituted by God.  Therefore, whoever resists the

3    authorities resists what God has appointed; and those who

4    resist will incur judgment.

5           Your actions let down your country, sir, but they

6    also let down your church.  And while that is a matter

7    between you and God, not me, I hope you see what damage

8    statements like that does to the values and institutions

9    that I believe you care about.

10          I know that you didn't assault anyone, that you

11   didn't damage any property, and I believe you had no intent

12   of breaking into the Capitol when you woke up on January

13   6th.

14          I also credit what you were saying about trying to

15   kind of be concerned about officers' safety and also putting

16   yourself between them and the crowds.  I'll say that your

17   very concern about that, I mean, it kind of highlights the

18   danger of mobs, that -- it just kind of creates a situation

19   that awful things like you suggested, an officer shooting

20   into a crowd, you know, never would normally happen except

21   for people like you who associated themselves with this

22   thing that just got completely out of control.

23          Ultimately, I think these are mitigating factors

24   in your favor.  But I hope you also see that when people

25   allow themselves to get swept up into a mob, they end up

1    creating chaos and lawlessness that the vast majority of

2    those people individually never would have caused or chosen

3    to do.  That's the dangerousness of mobs.

4         Based against all of this is your history and

5    characteristics.  You have a strong employment record.  I

6    have reviewed the glowing letters in your support, and you

7    have only one old misdemeanor conviction.  That does put you

8    in a different category from many January 6 misdemeanants I

9    have sentenced who have no criminal history, but I still

10   think on balance your history and characteristics argue in

11   your favor.

12        I also note that you have been compliant with your

13   pretrial release conditions in this case, and I agree with

14   your attorney that you deserve credit for being candid with

15   the FBI.

16        I also accept what you've said today.  I do think

17   you are remorseful, and I appreciate that.

18        In light of all this, I have minimal concerns

19   about recidivism here.  I think the more pressing factors

20   are promoting respect for the law and providing just

21   punishment for the offense.  I do believe that the *Ericson*

22   case, 21-CR-506, is probably the most comparable to this

23   case, although of course there are some factors that differ

24   from it.  Mr. Ericson had also entered the Speaker's suite;

25   and as in that case, I think some jail time is necessary

1    here.

2             I do not agree, however, with the Government's

3    recommendation of 90 days.  I think that's excessive.  I

4    think the probation office's recommendation is closest to

5    the mark.

6             I'll now impose the sentence.

7             It is the judgment of the Court that you, Michael

8    Timbrook, are hereby sentenced to serve 12 months of

9    probation.  As a condition of your probation, you must serve

10   a total of 14 days of intermittent confinement.

11            The intermittent confinement shall be served for

12   seven consecutive weekends at a facility designated by the

13   Bureau of Prisons.

14            You must follow the rules and regulations of the

15   facility in which you are designated.  You must also pay

16   $500 in restitution and a $10 special assessment.  Full

17   payment of all financial obligations stated herein is an

18   explicit obligation of your probation.

19            The $10 special assessment is immediately payable

20   to the Clerk of the Court for the U.S. District Court for

21   the District of Columbia.

22            Restitution payments shall be made to the Clerk of

23   the Court for the U.S. District Court in the amount of $500

24   to be paid to the Architect of the Capitol, Office of the

25   Chief Financial Officer.  You must pay the balance of any

1    financial obligation owed at a rate of no less than $100

2    each month.

3          The Court finds that you do not have the ability

4    to pay a fine, and therefore waives a fine and any interest

5    owed on the restitution.

6          The probation office shall release the presentence

7    investigation report to all appropriate agencies, which

8    includes the United States Probation Office in the approved

9    district of residence, in order to execute the sentence of

10   the Court.

11         Pursuant to 18 USC 3742, you have the right to

12   appeal the sentence imposed by this Court if the period of

13   imprisonment is longer than the statutory maximum.  If you

14   choose to appeal, you must file any appeal within 14 days

15   after the Court enters judgment.

16         As defined in 28 USC 2255, you also have the right

17   to challenge the conviction entered or sentence imposed if

18   new and currently unavailable information becomes available

19   to you or on a claim that you received ineffective

20   assistance of counsel in entering a plea of guilty to the

21   offense of conviction or in connection with sentencing.

22         If you're unable to afford the cost of an appeal,

23   you may request permission from the Court to file an appeal

24   without cost to you.

25         Pursuant to *United States versus Hunter*, 809 F.3d.

1     677, from the D.C. Circuit in 2016, are there any objections

2     to the sentence imposed that are not already noted on the

3     record?

4               Mr. Kringer?

5               MR. KRINGER:  Nothing from the Government, your

6     Honor.

7               THE COURT:  And Ms. Jacob?

8               MS. JACOB:  No, your Honor.

9               THE COURT:  Ms. Baker?

10              THE PROBATION OFFICER:  Good morning, your Honor.

11              THE COURT:  You may have a seat, sir.

12              THE PROBATION OFFICER:  Considering that

13     Mr. Timbrook lives in Tennessee, we would request that his

14     supervision be transferred to the Middle District of

15     Tennessee and that his presentence report and all documents

16     be transferred for supervision purposes.  And we're asking

17     that the Court transfer jurisdiction; but, of course, that's

18     up to the Court to decide whether they want to transfer

19     jurisdiction as well.

20              THE COURT:  Any objection to that, Mr. Kringer?

21              MR. KRINGER:  No, your Honor.

22              THE COURT:  Ms. Jacob?

23              MS. JACOB:  No, your Honor.

24              THE COURT:  I'll transfer both jurisdiction and,

25     of course, authority for probation.

 1              Mr. Kringer, do you have a motion?

 2              MR. KRINGER:  We move to dismiss the remaining

 3     counts, your Honor.

 4              THE COURT:  Ms. Jacob?

 5              MS. JACOB:  No objection.

 6              THE COURT:  Without objection, the remaining

 7     counts will be dismissed.

 8              Mr. Kringer, anything else we should be discussing

 9     today?

10              MR. KRINGER:  No, your Honor.

11              THE COURT:  Ms. Jacob?

12              MS. JACOB:  Just one last point, your Honor; a

13     request, actually.

14              If the Court is able to in its order direct

15     whatever facility he is ultimately housed in during the

16     weekends he has to serve jail time, if the Court could

17     please make a note as to his CPAP machine, the necessity for

18     it, just to help accommodate him for those periods of time.

19              THE COURT:  Ms. Baker, do you have any thoughts on

20     that?  Is that something we can do?

21              THE PROBATION OFFICER:  Your Honor, I don't have

22     any opposition to it being reflected on the J&C, just to

23     ensure that BOP is aware.  We also will notify Tennessee.

24     But I don't think that it would hurt in any way that it is

25     noted on there.

 1                    THE COURT:  Ms. Jacob, maybe you can talk with

 2        Ms. Chaclan about some language to include on my order.

 3                    MS. JACOB:  Yes, your Honor.

 4                    THE COURT:  Thanks, folks.

 5                    Good luck to you, Mr. Timbrook.

 6                    (Proceedings concluded.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 18th day of June, 2022.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25